UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE, JR., ppa<br>ATTORNEY ALLISON JACOBS<br><br>v.<br><br>CITY OF WATERBURY, et al. | :<br>:<br>:<br>:<br>:<br>:<br>:    Case No.: 3:01cv2298 (SRU)<br><br>OCTOBER 28, 2005 |

## LOCAL RULE 56(a)1 STATEMENT

The plaintiff, Jane Doe, Jr., in support of her Motion for Summary Judgment submits the following Statement of Material Facts as to which the plaintiff contends there is no genuine issue to be tried:[1]

## THE PARTIES

1. At all relevant times, the plaintiff is and was an African American minor child and a resident of the City of Waterbury (the "City") and State of Connecticut. Transcript of Trial Proceedings, U.S. v. Giordano, Criminal No. 3:01CR216 (AHN) (hereinafter "Tr."), submitted as "Exhibit E" in the attached Appendix, at 404-05, 940, 1012.

2. At all relevant times, the defendant, Philip Giordano, was the Mayor of the City of Waterbury, Connecticut. Tr. at 69, 92, 224, 225, 346.

3. Philip Giordano took an oath three times as the Mayor of the City of Waterbury

---

[1] As an Appendix to her Motion for Summary Judgment, plaintiff submits the following exhibits:
    A.    City of Waterbury Charter, effective 1996-2002;
    B.    City of Waterbury Sexual Harassment Policy dated May 20, 1996;
    C.    Superseding Indictment dated September 12, 2001;
    D.    U.S. v. Giordano, 324 F.Supp.2d 349 (D.Conn. 2003) (denying defendant's Motion for Judgment of Acquittal); and
    E.    Excerpts of Trial Transcript, U.S. v. Giordano, No. 3:01CR216 (AHN).

to uphold the Constitution of the State of Connecticut and the United States. Tr. at 29, 1688.

4. At all relevant times, Philip Giordano was a principal and/or member of a law firm located at 1169 West Main Street, Waterbury, Connecticut. Tr. at 336, 1651.

5. At all relevant times, Guitana Jones was Jane Doe, Jr.'s biological aunt. Tr. at 375, 1073.

6. At all relevant times, co-plaintiff, Susan Roe, Jr., was a minor child and the cousin of Jane Doe, Jr., and daughter of Guitana Jones. Tr. at 375, 1075.

7. At all relevant times, Guitana Jones was known to Philip Giordano as a prostitute and drug user. Tr. at 377-78, 1650, 1754.

8. At all relevant times, Guitana Jones prostituted herself with and had a sexual relationship with Philip Giordano. Tr. at 381, 1650, 1663, 1724.

9. At all relevant times, the defendant, City of Waterbury, is and was a municipality located within the State of Connecticut with office buildings located at 235 and 236 Grand Street, and governed by the effective Charter and Code of Ordinances then in effect. Tr. at 17, 94, 163, 165.

**MAYORAL AUTHORITY UNDER THE CITY OF WATERBURY CHARTER**

10. Under the City of Waterbury Charter, Mayor Giordano was the Chief Executive Officer of the City, its highest ranking official. Tr. at 32, 42, 249; City Charter, Art. 1 § 2101 (submitted as "Exhibit A" in the attached Appendix).

11. The City Charter allows the Mayor "ex officio" status as chairman of all City boards and committees involving City finances and City expenditures. Tr. at 32; City Charter,

Art.1 § 2101.

12.  The City Charter confers upon the Mayor the duties of overseeing all City departments, including the police department. Tr. at 45, 46, 61; City Charter, Art. 1 § 2102(e).

13.  Under the City Charter, the Mayor appoints all City board members, commissions, and department heads and has the authority to call special meetings of any board of the City. Tr. at 45; City Charter, Art. 1 § 2102 (d) and (f).

14.  The City Charter establishes a "Strong Mayor" form of government wherein the Mayor is involved in all aspects of municipal government and establishes government policy. Tr. at 43, 48, 60.

15.  The City Charter authorizes and empowers the Mayor to assign to any officer of the City or Town of Waterbury any rights or duties that are not assigned in the City Charter, as the Mayor may determine. City Charter, Art. 5 § 2153.

16.  Under the City Charter, the Mayor has the power and discretion to assume the entire control and direction of the police force for a period not exceeding fifteen (15) days in cases of an emergency, and to exercise all the powers conferred upon the police and departments related thereto. Tr. at 34-35, 46; City Charter, Art.1 § 2102(a).

17.  Under the City Charter, the Mayor has the power and discretion to exercise whenever necessary, within the limits of the City, all powers given by law to sheriffs and to require the action of the Sheriffs, Deputy Sheriffs or policemen, or any and all of them together, to execute the laws within the City limits. Tr. at 36, 46; City Charter, Art. 1 § 2102(b).

18.  Under the City Charter, the Mayor has the power and discretion to suspend, and remove for cause, any board member appointed by the Mayor, or any appointed official. Tr. at

37; City Charter, Art. 1 § 2102(d).

19. Under the City Charter, the Mayor has the power to make and enforce such rules and regulations as he may deem advisable for and concerning the organization, management, and operation of all offices and departments and agencies; Within the limits of appropriations, the Mayor has the power to fix the numbers and kinds of offices and positions and the rates of compensation for all officers and employees, except as otherwise provided by the Charter. City Charter, Art. 1 § 2102(e)

20. Under the City Charter, the Mayor has the power and discretion to have a seat and voice and introduce ordinances on the board of Alderman. Tr. at 45; City Charter, Art. 1 § 2102(g).

21. Under the City Charter, it is the duty of the Mayor to either approve or disapprove each vote, resolution, order or ordinance passed by the board of Aldermen. Tr. at 34, 45; City Charter, Art. 1 § 2101(f).

22. Under the City Charter, the Mayor has the power and discretion to issue a warrant to compel the attendance of City Board members at meetings. Tr. at 45; City Charter, Art. 1 § 2102(j).

23. Under the City Charter, the Mayor has a final say in the budget, with general supervision of the director of the budget, and general direction of the director of finance. Tr. at 74; City Charter, Art. 1 § 1301(b) and 1351(a).

24. Under the City Charter, it is the duty of the Mayor to cause the laws and ordinances to be executed and enforced and to conserve the peace within the City and to be responsible for the good order and efficient government of the City. Tr. at 33, 46-7; City Charter,

Art. 1 § 2101(a).

## OTHER EVIDENCE OF MAYORAL AUTHORITY AND POWER

25. Mayor Giordano promulgated the City's Sexual Harassment Policy and wrote an attached memorandum from him to all municipal employees. See City of Waterbury Sexual Harassment Policy dated May 20, 1996 (submitted as "Exhibit B" in the attached Appendix); See also Tr. at 1938.

26. Mayor Giordano claimed that, as Mayor, he was responsible for the daily operations of the City, including public safety. Tr. at 147, 1708.

27. Mayor Giordano used the City's emergency fund and his control over the board of finance, granted to him by the City Charter, to procure a burner for heating a school building while school was not in session. Tr. at 1905.

28. Mayor Giordano used the City's emergency fund and his control over the board of finance, granted to him by the City Charter, to procure the demolition of a building. Tr. at 1906.

29. Mayor Giordano and/or his staff used the power and control over the board of finance, granted by the City Charter, to have a car detailed in anticipation of a visit from the President of the United States, without using the proper channels to approve such an expenditure. Tr. at 302-306, 315, 1393-1395.

30. Mayor Giordano accepted gifts in exchange for securing City contracts in violation of the City Charter. Tr. at 1918-1925

31. After the State of Connecticut had taken control of the City's finances in March of 2001, Mayor Giordano used his power and control over the board of finance, granted to him by

the City Charter, to secure a contract with a natural gas company that had made contributions to Giordano's United States Senate Campaign. Tr. at 1950-1951.

32.  At all relevant times, Mayor Giordano held meetings with City department heads and held press conferences with the media. Tr. at 396, 1960.

33.  In or around January of 1996, Mayor Giordano issued an executive order to the Superintendent of Police regarding the promotion of people within the police department. Tr. at 96-97.

34.  On or around January 31, 1996, Mayor Giordano issued an executive order for all department heads to reduce the number of take-home vehicles that were supplied to City employees. Tr. at 99-100.

35.  Mayor Giordano involved himself with Police Department response time. Tr. at 100-10, 1708.

36.  Mayor Giordano wanted to be notified regarding any City emergencies. Tr. at 109.

37.  Mayor Giordano was present at murder and other crime scenes. Tr. at 114-115, 201, 204, 205, 238, 240, 241, 242, 1698, 1710.

38.  Mayor Giordano participated in the Waterbury Police Department's "Operation Sweep", initiated bike patrol, and had involvement in establishing police precincts. Tr. at 246-7, 1709.

39.  The Waterbury Police Department submitted its budget to Mayor Giordano. Tr. at 124.

40.  Mayor Giordano administered oaths to police officers at swearing in ceremonies.

Tr. at 114, 1701, 354, 358, 359.

41. Superintendent of Police Flaherty was suspended by Mayor Giordano for failure to follow an order given by Mayor Giordano and for failure to keep Mayor Giordano informed regarding certain police matters. Tr. 61-62. 102-103, 1694

42. Superintendent of Police Flaherty was effectively terminated by Mayor Giordano and was out of rank for two years. Tr. at 1633, 1693.

43. Mayor Giordano was visited by Waterbury school children at the City of Waterbury Mayor's Office and also made appearances as Mayor at Waterbury schools. Tr. at 278, 285-286, 374, 637, 638, 639, 640, 642, 644, 645, 646, 659, 1605, 1631, 1728.

44. In March of 2001, the State of Connecticut created an oversight board to take over the finances of the City. The Mayor fought for and retained a position on the oversight board. Tr. at 59, 1685, 1948.

**MAYOR'S UNMARKED POLICE VEHICLE, CELLULAR TELEPHONE AND BADGE**

45. At all relevant times, Mayor Giordano operated and/or was driven in an unmarked police car (a black Crown Victoria) owned by the City. Tr. at 116, 129, 211, 235, 364, 1403, 1404, 1640, 1699

46. Mayor Giordano's unmarked police car was equipped with sirens and lights. Tr. at 117, 129, 211, 236, 1404, 1699

47. Mayor Giordano's unmarked police car was equipped with a police radio. Tr. at 117, 129, 211, 236, 1404, 1699, 1700

48. Mayor Giordano's unmarked police car bore Connecticut license plate "1-WBY".

Tr. at 117, 209, 235, 291, 294, 295, 297, 300, 569, 1404.

49. Mayor Giordano's unmarked police car was maintained and regularly cleaned and fueled by the City. Tr. at 117, 257, 1405, 1406, 1408, 1902.

50. Mayor Giordano used the lights and sirens in his police vehicle throughout the City for non-emergency situations personally or with a member of his staff as a driver. Tr. at 244-245.

51. At all relevant times, Mayor Giordano was assigned and used a cellular telephone with the number (203) 410-7365. Tr. at 254, 361, 395, 911, 922

52. The above mentioned cellular phone with the number (203) 410-7365 was subscribed to by the City, and fees for usage were paid for by the City. Tr. at 254, 914, 922

53. The service provider for the above mentioned cellular telephone with the number (203) 410-7365 was Nextel Communications. Tr. at 253.

54. At all relevant times, Mayor Giordano was assigned and used a cellular telephone with the number (203) 525-2655. Tr. at 361, 913, 948

55. The above mentioned cellular phone with the number (203) 525-2655 was subscribed to by the City, and fees for usage of which were paid by the City. Tr. at 914.

56. The service provider for the above mentioned cellular telephone with the number (203) 525-2655 was Cingular Wireless. Tr. at 255.

57. Mayor Giordano used the above mentioned Nextel cellular phone and the above mentioned Cingular cellular phone to conduct City business and communications. Tr. at 361

58. At all relevant times, Mayor Giordano carried a badge identifying him as the City of Waterbury Mayor. Tr. at 252, 364, 1629.

59. Mayor Giordano's staff member, William Cugno, obtained City of Waterbury badges for himself, Mayor Giordano, and other members of Mayor Giordano's staff. Tr. at 268, 288, 364, 1629, 1630

60. Mayor Giordano and the members of his staff who received the above-mentioned badges had arrest authority pursuant to the City of Waterbury Charter. Tr. at 1639.

61. Mayor Giordano's staff instilled the sense of military command in Giordano's administration as Mayor. Tr. at 1632.

**SEXUAL ABUSE**

62. For an undetermined period of time commencing in approximately November of 2000 until July of 2001, Mayor Giordano solicited sexual acts from Jane Doe, Jr., and her cousin, Susan Roe, Jr., by calling Guitana Jones from cellular telephones authorized and paid for by the City of Waterbury. Tr. at 404, 406, 410, 548-9, 939, 945, 961, 983-4, 989, 994, 1003, 1747, 1775, 1782-3, 1793, 1826-8, 1834-9, 1842.

63. Jones arranged for drivers to transport her, Susan Roe, Jr., and/or Jane Doe Jr., to Mayor Giordano for the purpose of engaging in sexual acts with Mayor Giordano. Tr. at 453-8, 664, 680-1, 693, 715, 718, 765, 770, 781, 785, 787, 793, 798, 802, 804, 807, 1098-99.

64. Guitana Jones first brought the minor children to Mayor Giordano for the purpose of engaging in sexual acts when Susan Roe, Jr., was eight years old and Jane Doe, Jr., was ten years old. Tr. at 404, 1196, 1212.

65. Mayor Giordano knew that Jane Doe, Jr., was between the ages of seven and twelve at the time in question. Tr. at 1775.

66. Said sexual acts did occur between Mayor Giordano and Jane Doe, Jr. Tr. at 1076-77, 1083-4, 1088, 1093.

67. Said sexual acts did occur between Mayor Giordano and Susan Roe, Jr. Tr. at 1214-17.

68. Said sexual acts took place at Mayor Giordano's law office, 1169 West Main Street. Tr. at 412, 526, 1076, 1080, 1219-20.

69. Said sexual acts took place at the City of Waterbury's Mayor's office, 236 Grand Street. Tr. at 418-22, 426, 526, 1080, 1085, 1219-20.

70. When said sexual acts took place at the City of Waterbury's Mayor's office it was at a time when no members of Mayor Giordano's staff were there and the office was closed to the public. Tr. at 497, 1087.

71. Said sexual acts took place at Mayor Giordano's residence, 157 South Wind Road. Tr. at 1080, 1090, 1219-20.

72. Said sexual acts took place at the home of City of Waterbury Budget Director, Thomas Ariola, 827 Oronoke Road, Building 10, Unit Three. Tr. at 442, 1093, 1381.

73. Said sexual acts took place in Mayor Giordano's unmarked police vehicle. Tr. at 1096, 1219-20.

74. Said sexual acts caused Jane Doe, Jr., and Susan Roe, Jr., to suffer pain and physical discomfort. Tr. at 1083, 1222-23.

75. Mayor Giordano paid Guitana Jones for said sexual acts, at times as much as $200 per week. Tr. at 466, 549, 1102, 1724.

76. Mayor Giordano repeatedly told Jones and/or the minor children following sexual

encounters that he would have her put in jail if she told anyone about said sexual acts. Tr. at 424-5, 448, 463, 1101.

77. Jones told Jane Doe, Jr., and her cousin that they would get into trouble or she would go to jail if they said anything to anyone about said sexual acts. Tr. at 463.

78. Jones did anything Mayor Giordano asked her to because she believed she would be put into jail if she refused. Tr. at 447.

79. Jones believed Mayor Giordano ran the City of Waterbury and that the Police Department worked for him. Tr. at 392, 466.

80. Mayor Giordano once told Jones that he had been at the murder scene of a prostitute she knew. Tr. at 464.

81. On one occasion, Mayor Giordano had Guitana Jones call his home pretending to be the City of Waterbury police in order to afford him an excuse to leave his family and meet for a sexual encounter. Tr. at 980, 1821.

82. When Jones was picked up by the FBI, she asked them if "Phil" had sent them. Tr. at 474, 569.

83. Susan Roe, Jr., understood the Mayor's job to be to protect the City and to watch over everyone in the City "like God" and that he "sees everything like God." Tr. at 1194, 1197.

84. Jane Doe, Jr., knew that Philip Giordano was the Mayor of the City of Waterbury. Tr. at 1073, 1081.

85. Jane Doe, Jr., thought the Mayor could "rule everyone" and was the "boss of everyone" in the City of Waterbury. Tr. at 1073.

86. Jane Doe, Jr., thought something bad would happen to her or her family if she told

anyone about said sexual acts and feared Mayor Giordano. Tr. at 1101, 1078.

87.   Mayor Giordano acknowledged and admitted that Jane Doe, Jr., has a right to be free from unwanted sexual advances. Tr. at 1707.

**PRIOR CRIMINAL PROCEEDING AGAINST MAYOR GIORDANO**

88.   On September 12, 2001 a grand jury returned an eighteen-count superseding indictment charging Mayor Giordano with (1) depriving the two minor children of their due process liberty right to be free from sexual abuse in violation of 18 U.S.C. § 242 (Counts One and Two); (2) conspiring to knowingly initiate the transmission of the minor victims' names by using facilities and means of interstate and foreign commerce in violation of 18 U.S.C. §§ 2425 and 371 (Count Three); and (3) knowingly initiating the transmission of the minor victims' names by using facilities and means of interstate and foreign commerce with the intent to entice, encourage, offer, and solicit them to engage in sexual activity in violation of 18 U.S.C. § 2425 (Counts Four through Eighteen). See Superseding Indictment dated September 12, 2001 (submitted as "Exhibit C" in the attached Appendix).

89.   On March 12 through March 24, 2003, the matter of United States v. Philip Giordano, was tried to a jury. U.S v. Giordano, 324 F.Supp.2d 349 at 351 (D.Conn.2003) (submitted as "Exhibit D" in the attached Appendix).

90.   On March 25, 2003, the jury returned a verdict of guilty on seventeen out of eighteen counts in the superseding indictment. The jury was unable to reach a verdict as to Count Ten. Id. at 351; Tr. at 2143-46.

91.   Sometime following the jury verdict, Mayor Giordano filed a Motion for

Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Giordano, 324 F.Supp.2d at 351.

92. The court denied Mayor Giordano's Motion for Judgment of Acquittal, finding with respect to Counts One and Two:

> overwhelming evidence showing Defendant acted under color of law, including the following: (1) that Defendant was the Mayor of the City of Waterbury throughout the entire time that he was sexually abusing the two minor victims; (2) that Defendant cloaked himself with the trappings of official authority, including a police-type badge, a cellular phone that was paid for by the City, and an unmarked Waterbury police cruiser with lights and a siren, which was available for his use 24 hours a day; and (3) that Defendant, as Mayor of Waterbury, had promulgated a sexual harassment policy, thereby corroborating his knowledge that sexually explicit conduct in the workplace could be viewed as coercive. In fact, Defendant admitted on cross-examination that forcing minor children to have sex with him would constitute a violation of their civil rights.

Id. at 352.

93. In addition, the court found:

> overwhelming evidence presented at trial to sustain the guilty verdicts on Counts Three through Nine and Eleven through Eighteen. This evidence included the direct testimony of Guitana Jones and the minor victims, which indicated that Defendant and Jones had arranged for sexual liaisons between Defendant and the minor victims on numerous occasions from November 2000 to July 2001. Various other witnesses corroborated the testimony of Jones and the minor victims.....Defendant's own statements in more than 100 intercepted telephone conversations further substantiated the testimony of Jones and the minor victims.

Id. at 353.

Respectfully submitted,

        THE PLAINTIFF
        **JANE DOE, JR., ppa ATTORNEY ALLISON JACOBS**
        **GUARDIAN AD LITEM**

By: _____
        **MICHAEL S. HILLIS**
        DOMBROSKI, KNAPSACK & HILLIS LLC
        129 Whitney Avenue
        New Haven, Connecticut 06510
        (203) 624-9096
        (203) 624-1308 (Fax)
        Federal Bar No.: ct11867

## CERTIFICATION OF SERVICE

I hereby certify that a true copy of the foregoing **RULE 56 STATEMENT** was mailed, postage prepaid, this **28th** day of **OCTOBER, 2005**, to all counsel of record as follows:

**MICHAEL W. MACKNIAK, ESQ.**
87 Meadow Street
Naugatuck, Connecticut 06770

**ERSKINE D. MCINTOSH, ESQ.**
The Law Offices of Erskine D. McIntosh, P.C.
P.O. Box 185789
Hamden, Connecticut 06518-0789

**GERALD L. HARMON, ESQ.**
The Law Offices of Gerald L. Harmon
290 Pratt Street
Meriden, Connecticut 06450

**ELLIOT B. SPECTOR, ESQ.**
**NOBLE, SPECTOR, YOUNG & O'CONNOR**
One Congress Street, Fourth Floor
Hartford, Connecticut 06114

**ANDREW B. BOWMAN, ESQ.**
1804 Post Road East
Westport, Connecticut 06880

_____
**MICHAEL S. HILLIS**